STATE v. THE PORT ROYAL AND AUGUSTA RY. CO.

KING v. SAME.

1. APPEAL—REMOVAL OF CAUSES—COURTS—JURISDICTION.—While a trial court should not, pending an appeal from its order refusing to grant a removal of the case to the Federal Court, proceed with the case until after a decision on the appeal, the decision of the Court that

it is not ousted of jurisdiction by the petition for removal, and its proceeding with the case, will not be held *fatal* error, where the order was properly granted, and it is important that an early decision be had.

2. PLEADING—VERIFICATION—CASES DISTINGUISHED.—A verification of a pleading is sufficient, though the affiant states that the matters therein contained "are true of his own knowledge, except as to those matters therein stated on information and belief, and as to those matters he believes them to be true," where some of the allegations are made expressly upon information and belief. Distinguished from *Smalls* v. *Wilder*, 6 S. C., 402; *Hecht* v. *Friesleben*, 28 S. C., 181; *Burmester* v. *Moseley*, 33 S. C., 251.

3. CORPORATION — STOCKHOLDERS — INJUNCTION — RECEIVER. — Minority stockholders may maintain an action requiring the corporation to resume the exercise of its public duty, for the appointment of a receiver, and for an injunction to restrain the further usurpation of its franchises by lawless intruders.

4. RECEIVER—COMITY BETWEEN STATE AND FEDERAL COURTS.—In an action in a State Court to forfeit the charter of a corporation for which a receiver has been appointed by a Federal Court, it is proper to appoint a receiver, with directions to him to apply to the Federal Court for possession of the property.

Before ALDRICH, J., Beaufort, February, 1893.  Affirmed.

The following is so much of the opinion of Judge Aldrich in the second case as is necessary, in connection with the statement of facts in the opinion, to understand the question involved:

The complainants filed their complaint as stockholders, asking that their corporation may be required to resume the exercise of its public duty; for an injunction restraining the further usurpation of its franchise by lawless intruders; to have the present requirements of the State enforced, so as to prevent a forfeiture of the charter by the State, and to preserve and continue the corporate life and existence of the corporation. The right of the stockholders to bring such an action is well established. Whilst minority stockholders cannot enjoin the acts of the majority in the lawful management of the business of the corporation within the limits of its chartered powers, although they may differ with such majority as to the policy pursued, still if the acts

contemplated are *ultra vires* and contrary to public policy, and such as are liable to produce a forfeiture of the charter, they have a right to go into a court of equity and ask its interference. *Nathan* v. *Tompkins*, 82 Ala., 437. The fact, even if it be admttted that they became stockholders after the wrongs complained of had commenced, and while they were being committed, does not prevent the exercising the right of appeal to the Court. They succeed to the right of their predecessors. The fact that the company was pursuing an illegal policy when they purchased their stock as that such policy was liable to work a forfeiture of the charter, does not preclude them from going into the Court to bring to its attention this illegal act, and ask that it shall be stopped. Morawetz on Corporations, sec. 265. The complaint alleges that application had been made to the stockholders, asking that action be taken in the matter by the corporation itself, and that it had failed and neglected so to do. It further shows that the board of directors are so much under the influence of the Central Railroad Company that any application to them to bring such an action as the present one, or take any course contrary to the interest of the Central Railroad, would be useless. Under these circumstances, the right of the stockholders to bring this bill is clear and well settled. *Hart* v. *Erie R. R. Co.*, 8th Blatchford, 347, 407, 409; Morawetz on Corporations, sec. 242; *Brewer* v. *Boston Theatre Co.*, 104 Mass., 378; *Howes* v. *Oakland*, 104 U. S., 450.

It is urged that the silence of the stockholders for a number of years, precludes their bringing this action. This objection does not seem to be well founded. Admitting that the control of the Port Royal Railway Company by the Central Railroad Company, is, as alleged, and *ultra vires*, no lapse of time will make it right. If it was ever illegal and wrong, it will always continue so; and such illegal usurpation and acts are not cured by lapse of time. See *Thomas* v. *R. R. Co.*, 101 U. S., 71, 86, 87; *Central Transportation Co.* v. *P. P. & C. Co.*, 139 U. S., 49. Nor does the objection that

the complainants are barred by their *laches* appear to be well taken. It is not alleged that there has been any change in the position of affairs as existing when the present complainants purchased their stock, made either by the Central or the Port Royal Railroads, based upon the non-action of the stockholders, and there seems no reason why, in equity, they should not be allowed now to bring the present action.

In *Gallagher* v. *Caldwell*, 145 U. S., 373, the Supreme Court of the United States says: "*Laches* is not like limitation, a mere matter of time, but principally a question of the inequity of permitting a claim to be enforced; and in equity founded upon some change in the condition or relations of the property or the parties." But, aside from and in addition to all this, the complaint brings to the attention of the Court an entirely new phase, in reference to the affairs of the defendant, from that which has existed before.

It alleges that the State of South Carolina, because of this illegal misuse of the franchise of the Port Royal Railway Company, has instituted proper proceedings and is seeking therein to forfeit the charter of that corporation, and will do so now unless such illegal misuse is abated and such illegal control is stopped. This is an entirely new matter, and in reference thereto the plaintiffs have certainly acted with all possible promptness. It presents to the stockholders of the Port Royal Railway Company a very serious condition of things, and would appear to give the highest justification to this present action, brought by the complainants as minority stockholders seeking to save the corporate life of their corporation, and prevent the forfeiture of its charter; they invoke the aid of this Court, and ask that it will afford that relief by preventing the continuance of the evils complained of, and thereby prevent the forfeiture. The necessity seems to be pressing, and affords a reason for immediate action which never existed before. Aside, therefore, from the other reasons given, this would seem to entirely answer the objections as to laches.

37—45

From the Circuit decrees the defendant appeals.

*Messrs. Mitchell & Smith,* for appellant.

*Hon. D. A. Townsend,* attorney general, *Messrs. Smythe & Lee, W. J. Verdier,* and *Alex. C. King,* contra.

Nov. 30, 1895. The opinion of the Court was delivered by

MR. JUSTICE POPE. On the 27th day of January, 1893, these actions were commenced. The complaint sets forth with great care circumstances that may be thus partially summarized: In 1857 an act was passed by the General Assembly of this State incorporating certain persons under the name of the Port Royal Railroad Company, whose object was the construction of a line of railroad leading from the harbor at Port Royal, in this State, towards the city of Augusta; and such corporation, desiring to construct their railway into the city of Augusta, in the State of Georgia, obtained the passage by the legislature of the last State of a charter authorizing said original corporators to construct and extend such Port Royal Railroad across the Savannah River, and into the city of Augusta. The railroad was not rapidly constructed, and in 1870 the General Assembly of South Carolina continued the charter, but provided in the act that the railroad should be completed during the year 1871. Bonds were issued by the corporation, secured by a mortgage of the railroad property. Upon default being made in the payment of interest on said bonds, a suit in foreclosure of the mortgage was begun in the Circuit Court of the United States for the district of South Carolina, and an ancillary suit in the Circuit Court of the United States for the district of Georgia, and under a decree therein in both of said courts the railroad property was sold, and was purchased by certain individuals, who, on the 29th day of June, 1878, in compliance with a statute of the State of South Carolina, and a similar statute of the State of Georgia, on the 29th day of June, 1878, filed in the office of the secretary of state of the States of South Carolina and Geor-

gia, respectively, a notice that they would operate said railroad under the new name of the Port Royal and Augusta Railway Company. Under this new arrangement, $750,000 of stock was issued, each share being of the value of $100, and the holder of each share was entitled to one vote. Also $1,500,000 of general mortgage bonds were issued, the holders of said bonds being entitled to one vote for each $100 of the face value thereof. Under this arrangement, the railroad was very successfully managed. Large compresses were erected at Port Royal; grain elevators, extensive warehouses, workshops, and roundhouses were also built in said Port Royal. These arrangements and the management of the railroad contributed largely to the welfare and benefit of the public. But, in the year 1881, the Central Railroad and Banking Company, a creature of the legislature of the State of Georgia, which had been chartered in 1835, and which owned the Central Railway Company, in said State, running from the city of Savannah into the interior of the State, purchased a majority of the capital stock and general mortgage bonds of the Port Royal and Augusta Railway Company, and elected such directors as they chose, and with such control placed the president and other general officers of the Central Railroad and Banking Company in control of this South Carolina corporation. It is claimed that under this new control the wharfs, grain elevators, and warehouses at Port Royal were left idle, and rotted from disuse. Also the workshops were removed from Port Royal. And, further, that, instead of said railroad being run in the interest of the public in South Carolina and that portion of Georgia through which it passed, it was devoted to building up the commerce of the city of Savannah, and the business of the Central Railroad. Complaints being made, the General Assembly of South Carolina passed, in 1891, a joint resolution, empowering the attorney general of the State to investigate the conduct and management of said railroad, and if, in his judgment, cause exist therefor, that he institute proceedings to revoke the charter

theretofore granted to the aforesaid company, and that he report his action to the next General Assembly. That about the 4th day of July, 1892, the Central Railroad and Banking Company being insolvent, and anxious to make terms with its creditors, through its president, H. M. Comer, exhibited a bill in equity in the United States Circuit Court for the district of Georgia, in the name of the Central Railway and Banking Company, as plaintiff, against the Farmers' Loan and Trust Company of New York, and others, as defendants, whose object was the appointment of a permanent receiver for the Central Railroad and Banking Company. That in the said bill, after reciting the embarrassed financial condition of the said Central Railroad and Banking Company of Georgia, it set out the facts that numerous other railroads were owned or controlled by the said Central Railroad and Banking Company, forming part of what was therein styled the Central Railroad System, and for them a receiver was also requested at the hands of the Court, "to secure the integrity of this system;" and that among these railroads so stated to be owned or controlled by the Central Railroad and Banking Company was the Port Royal and Augusta Railway. That part of the relief asked for by the plaintiff in its bill was that the Court would appoint the same receiver for the Port Royal and Augusta Railway Company as for the plaintiff, so that the same might be operated jointly, and the "Central System be thus not dismembered." Upon the filing of this bill, a rule to show cause was granted, requiring the Port Royal and Augusta Railway Company to appear and show cause why a receiver should not be appointed for it. On the 14th day of July, 1892, H. M. Comer, the president of the Central Railroad and Banking Company, was appointed temporary receiver of the railroads composing the alleged "Central System," including the Port Royal and Augusta Railway Company. That to induce the Court to grant the order in question, the said H. M. Comer, acting as the president of the Port Royal and Augusta Railway Company, filed an

answer in its name in said cause, and consented to this action being taken. On the same day such temporary receiver was made permanent receiver. Under such orders the said H. M. Comer, as receiver, took possession of defendant railway, and such receiver is operating said railway at the date of the complaint being filed. Subsequently to, but shortly after, the 14th day of July, 1892, an ancillary bill was filed by the said Central Railroad and Banking Company against the Farmers' Loan and Trust Company and others, as defendants, and the Port Royal and Augusta Railway Company, in the Circuit Court of the United States for the district of South Carolina, praying the confirmation of the appointment of the said H. M. Comer, as receiver of the Port Royal and Augusta Railway Company, but that no subpœna was issued in said suit for the latter company; but that one of plaintiff's solicitors, assuming to act for said last railway company, accepted service of said bill for it. That such solicitor for plaintiff asked and obtained the appointment of said H. M. Comer, as receiver of the Port Royal and Augusta Railway Company in South Carolina, who has taken possession of said railway company as such receiver. Further, it is alleged that said receiver is conducting the said railway company solely with a view to the benefit of the Central Railroad and Banking Company, an insolvent road, and entirely to the subversion of the charter duties of the Port Royal and Augusta Railway Company. It is alleged and charged that the failure of the president, directors, and other officers of the Port Royal and Augusta Railway Company to properly protect and answer for the said company, and by their improper and unlawful aiding and abetting the said Central Railroad and Banking Company of Georgia, and its plans and objects, the rights and interests of the Port Royal and Augusta Railway Company have been jeopardized and disregarded, and its franchises surrendered into the hands of a foreign corporation; and the said Port Royal and Augusta Railway Company has stripped itself of its property, and surrendered its franchises,

abandoned its charter, and is no longer in position to fulfill its obligation to the public, and to discharge the public trust committed to it by the State of South Carolina. It is further alleged that the attorney general of the State of South Carolina, at the November, 1892, session of the General Assembly, reported to that body the result of his investigation into the conduct and management of the Port Royal and Augusta Railway Company; and thereafter his excellency, the governor of the State of South Carolina, in a special message to the General Assembly of said State, called attention to the violation of its charter and franchises by the said Port Royal and Augusta Railway Company, and urged the necessity of immediate steps on the part of the said General Assembly to protect the public interests by remedying the existing abuses, or by forfeiting the charter of the said railway company; and that the State of South Carolina, through its attorney general, now proceeding under the direction of the General Assembly, now brings this action in order to remedy and prevent, if possible, the unlawful acts of the said defendant railway company; or, on failure to accomplish this, to resort to the severe and sovereign remedy of an ouster and forfeiture of its charter and franchises. It further alleged that, pending the hearing and determination of this matter, the present directors, officers, and agents will remain in charge of the defendant railway company, and that they will persist and continue in the misuse and abuse of its franchises, and the defendant railway company will continue to permit and aid the said H. M. Comer to retain possession and use of its property; and that thus the said defendant railway company will, through the said receiver, persist in the violation and abandonment of the powers and duties and trust committed to it, etc.

The prayer of the complaint demands judgment against the defendant railway company: (1) That the holding and ownership of the shares and bonds in defendant's corporation by the Central Railroad and Banking Company, with

the power to vote, be declared to be *ultra vires*, illegal, un-
authorized, and against public policy, and void, and that
the officers of the said defendant railway company be ousted
and enjoined from in any manner recognizing or regarding
such ownership and holding. . (2) That the control and
management of the defendant railway company by the Cen-
tral Railroad and Banking Company of Georgia, a rival and
competing line, or any receiver or officer of the said Central
Railroad and Banking Company, be declared against public
policy, unauthorized, unlawful, *ultra vires*, and void; and
that the officers and agents of the defendant railway com-
pany be enjoined and prevented from further obeying, or
in any manner recognizing, the said control and manage-
ment.    (3) That the defendant company may be ousted and·
enjoined from further permitting or suffering the said con-
trol and influence of the said Central Railroad and Banking
Company of Georgia, or in any manner aiding or abetting
the same.    (4) That any officers, directors, and agents of
the defendant company, elected or appointed by the illegal
votes of the Central Railroad and Banking Company of
Georgia, be declared to be disqualified from holding such
positions; and that the defendant · company be ordered to
take such steps as may be necessary, and as it may be able,
to place its affairs and franchises in the hands of officers
qualified, etc.    (5) That the defendant company, as soon as
it can elect lawful officers, be directed then to resume the
management and control of its business in all of its depart-
ments.    (6) That in the event the foregoing relief should
fail to remedy the evils complained of, then, as a last re-
sort, the charter of the defendant railroad be ousted and
forfeited, and its franchises and corporate powers terminated.
(7) That, pending the final determination of this action, a
temporary receiver be appointed.    This complaint was veri-
fied by the attorney general, on information and belief.

Judge James Aldrich, on the 27th day of January, 1893,
granted an order appointing John H. Averill temporary re-
ceiver, and requiring the defendant company to show cause

before him why such receiver should not be made perma-
nent. By consent, the hearing was postponed from the
early day fixed in the order until about the 11th of Febru-
ary, 1893, at which time the defendant railway company
filed an elaborate return, which controverted many of the
allegations of the complaint, and denied the right of action
as well as the relief prayed for.

The first proposition raised was the question of jurisdic-
tion, which was bottomed upon these facts: As soon as
notice reached the defendant company of the order of Judge
Aldrich of the 27th January, 1893, such defendant, by peti-
tion, and the usual bond in such cases required, sought to
remove the action from the Court of Common Pleas for
Beaufort County, in the State of South Carolina, into the
Circuit Court of the United States for the district of South
Carolina, upon the ground that there were federal questions
involved. Judge Aldrich declined to admit that his juris-
diction had been terminated by the compliance by the de-
fendant company with the formal requirements of the law
incident to the removal of causes from the State to Federal
Courts. From this decision the defendant railroad appealed
to this Court.

Since the decision of this Court in the same case between
the same parties, filed on the 23d day of November, inst.,
wherein we have unanimously decided that, under the lat-
est decisions of the Supreme Court of the United States,
which are carefully cited in the judgment announced
by Mr. Justice Gary, we have no difficulty in reach-
ing the conclusion that the Circuit Judge committed
no error in holding that no cause for removal existed.
After the Circuit Judge had announced such conclusions,
instantly thereupon an appeal was taken by the defendant
from his decision. And when it was proposed by the plain-
tiff to go forward in the further consideration of the case,
the appellant insisted that the Circuit Court was ousted of
jurisdiction because of the aforesaid appeal. This presents
a nice question, and we will now consider it. Whenever a

question of jurisdiction is suggested, great care is required of the Court, for, no matter what the issue raised may be, if it is not competent for the Court to hear and determine same, it is worse than time wasted to proceed. In the case at bar, it seems to us that this appeal involved the merits, for if, in the consideration of the question of removal, this Court had concluded that the Circuit Court had no jurisdiction, all of its subsequent proceedings would have been futile. Our leading case on this subject is *Bank* v. *Stelling*, 32 S. C., 102, which has been recognized and applied in the cases of *Capell* v. *Moses*, 36 S. C., 559; *Sease* v. *Dobson*, 34 S. C., 345. In the first case cited, a motion was made in the Circuit Court to set aside the service of the summons upon defendant, Stelling, which was refused by the Circuit Judge, and from this refusal an appeal was taken. This Court held that, pending such appeal, it was error for the Circuit Court to proceed with the hearing of the case, and in delivering the opinion of the Court on that appeal, the late Chief Justice Simpson used this language: "Here the intermediate decree of Judge Norton, holding that Stelling had been properly made a party, was a vital one to the jurisdiction of the Court over the person of Stelling; and he certainly had the right to have the judgment of the Court of last resort on the question, whether he was a party, before he could determine whether he should answer or not. This decree, we think, was appealable; and, being appealable, the Court below could not go on, and determine Stelling's rights, when he was not a party, or at least when the question was pending in the Supreme Court." Upon the same principles it would seem that, pending the appeal from the order of his Honor, Judge Aldrich, denying the right of removal, the Court below should not have gone on to consider any of the other questions in the case until the vital question of jurisdiction had been finally determined by this tribunal of last resort. If it should be said that this Court, having now reached the conclusion that there was no error upon the part of Judge Aldrich in the conclusion which he

reached as to the question of jurisdiction, the error in proceeding to determine the other questions before the final determination of the question of jurisdiction becomes immaterial.    But the answer is, that the very same thing occurred in the case of *Bank* v. *Stelling*, *supra;* for in that case, although the Court did determine (31 S. C., 360), that there was no error on the part of Judge Norton in holding the service of the summons on Stelling to be good, yet, as his Honor, Judge Wallace, had proceeded to hear the case before this Court had determined this question of jurisdiction raised by the appeal from the order of Judge Norton, he erred in so doing.    While thus affirming the principles laid down in *Bank* v. *Stelling*, *supra*, we do not propose to apply such principles to these two cases for the following reasons:  These questions have been fully and exhaustively argued before us, and it is deemed important that an early decision should be had.    But we are careful to say that this action on our part must not be drawn into a precedent.

It is contended by appellant that the complaint is not properly verified.   In appellant's argument reliance is made upon the case of *Smalls* v. *Wilder*, 6 S. C., 402, which, however, does not support appellant's position; for, in the case first cited, the affiant stated that the allegations of the complaint were "true and correct in all particulars," without adding that such allegations were true "of his own knowledge," while here there was no such defect.    The attorney general of this State, who is the affiant, states that the foregoing complaint and information "are true of his own knowledge, except as to those matters therein stated on information, and as to those matters he believes [them] to be true."    Nor is this point sustained by the cases of *Hecht* v. *Friesleben*, 28 S. C., 181, relied on by appellant, or *Burmester* v. *Moseley*, 33 S. C., 251, for in both of these cases the allegations of the complaint were made as if upon affiant's own knowledge, whereas the form of the verification showed conclusively that some of the allegations were intended to be made upon information and

belief, but which were so intended it was impossible to ascertain. In the case at bar, however, some of the allegations in the complaint are expressly stated to be made upon information and belief, while there were others not so stated, and hence the form of verification adopted is unexceptionable.

The exceptions that raise the question in the second case, as to the right of some of the stockholders of the Port Royal and Augusta Railway Company to bring suit, cannot be sustained. There is quite sufficient in the record to bring this case within the principles laid down in *Hawes* v. *Oakland*, 104 U. S., 459, recognized and followed by this Court in *Latimer* v. *Railroad Co.*, 39 S. C., 44.

With one additional observation, we are quite content to rest our conclusion upon all the other points raised by the appellant upon the decree thereon of Judge Aldrich, which, to that extent, at least, will be reported.

The observation with which we desire to close is, that the complaint demurred to, because asking for the appointment of a receiver before judgment upon the merits, by its terms sets out that the appellant railway company, by its own act, and by the formal consent of its presiding officer, is already in the hands of a receiver, and, therefore, is not being operated by its own officers.

It is the judgment of this Court, that the judgment of the Circuit Court involved in these appeals in both the cases here heard together be affirmed.